**SO ORDERED: March 31, 2014.**



_____
**James M. Carr**
**United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| LORI ANN FECEK, | ) Case No. 12-13062-JMC-7 |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| LORI ANN FECEK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary Proceeding No. 13-50089 |
| | ) |
| SALLIE MAE, INC., | ) |
| | ) |
| Defendant. | ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS MATTER came before the Court for a bench trial on October 7, 2013 (the "Trial"). Plaintiff Lori Ann Fecek ("Fecek") appeared by counsel Ryan S. Wright. Defendant Sallie Mae, Inc. ("Sallie Mae") appeared by counsel Karl T. Ryan. This matter was taken under advisement

at the conclusion of the Trial with the parties permitted to submit post-trial briefing and/or proposed findings of fact and conclusions of law on or before November 6, 2013. The Court, having reviewed the evidence presented at the Trial, Plaintiff Fecek's Trial Brief filed on October 1, 2013 (Docket No. 28), Defendant Sallie Mae's Trial Brief filed on October 3, 2013 (Docket No. 30), Plaintiff Fecek's Proposed Findings Of Fact And Conclusions Of Law submitted via email on November 7, 2013, Defendant Sallie Mae's Proposed Findings of Fact and Conclusion of Law filed on November 6, 2013 (Docket No. 33) and the other matters of record in this adversary proceeding; having heard the presentations of counsel at the Trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## Procedural History

1.     On November 4, 2012 (the "Petition Date"), Fecek filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

2.     On April 1, 2013, Fecek initiated this adversary proceeding seeking a determination that her student loan debt owed to Sallie Mae should be discharged by reason of undue hardship pursuant to § 523(a)(8).[1]

3.     On June 6, 2013, this adversary proceeding was joined for trial with several other adversary proceedings[2] that Fecek filed to determine the dischargeability of other student loan debt (Docket No. 15). However, only this adversary proceeding was tried on October 7, 2013.

---

[1]     Unless otherwise noted, all statutory references are to the Bankruptcy Code.

[2]     Fecek v. Discover Bank, 13-50086, Fecek v. The National Collegiate Trust, 13-50087, and Fecek v. Nelnet, Inc. 13-50089.

Fecek's student loan debt owed to Discover Bank was declared dischargeable in a default judgment entered by this Court on November 25, 2013 in adversary proceeding number 13-50086. Fecek reached a settlement with intervening creditor Educational Credit Management Corporation in adversary proceeding number 13-50087 in which the parties agreed that Fecek would enter the William D. Ford program and the adversary case would be dismissed.

## Findings of Fact

*Student Loans at Issue*

1. Fecek is indebted to Sallie Mae pursuant to the terms of twelve (12) educational loan promissory notes ("Promissory Notes"). The loan was advanced to Fecek in various installments on the following dates: August 13, 2004; June 13, 2005; February 27, 2006; May 8, 2006; June 19, 2006; October 17, 2006; December 5, 2006; March 5, 2007; September 10, 2007; January 15, 2008; April 4, 2008; and August 25, 2006.

2. As of the filing of this adversary proceeding, there was an approximate balance due and owing under the Promissory Notes, including principal, interest, and fees totaling $279,910.87 (the "Educational Loan Debt"). The Educational Loan Debt consists of private student loans and is not backed by the United States government. The annual interest rates on the Promissory Notes vary from between 7.75% to 9.75%.

3. The current prime interest rate published in the March 27, 2014 edition of the Wall Street Journal is 3.25%.

4. Neither party introduced the Promissory Notes into evidence and neither party introduced evidence regarding the "repayment period" for the Educational Loan Debt except that it has started and may or may not have ended.

5. No evidence was introduced establishing what Fecek's contractual monthly payment amount is under the terms of the Promissory Notes, but testimony indicates that it is in excess of $2,000 a month. In her pre-trial brief and proposed findings of fact and conclusions of law, Fecek states that the monthly payment required by the Promissory Notes is $2,677.35.

6. As of the filing of this adversary proceeding, Fecek also owed student loan debt to the Department of Education in the amount of $64,771.59 (the "Federal Loan"), Discover Bank in the amount of $13,520.64, and Chase Bank in the amount of $16,531.00. However, the amount owed to Discover Bank was declared dischargeable in a separate adversary proceeding. Fecek and the Department of Education through intervening creditor Educational Credit Management Corporation entered a settlement which required Fecek to enter the William D. Ford program to pay the Federal Loan.

*Education and Employment Background*

6. Fecek is 43 years old. She is single and has no dependents.

7. Fecek received a Bachelor of Arts degree in Psychology in 1996 from Indiana/Purdue University and later returned to school and obtained a Bachelor of Science degree in Nursing in 2010 from Indiana University-Kokomo.

8. Fecek returned to school with the purpose of making a career change to improve her financial condition.

9. The Educational Loan Debt was incurred to pay for her cost of attendance at Marian College, Ivy Tech Community College, and Indiana University-Kokomo to acquire a degree in nursing.

10. Fecek incurred the Educational Loan Debt on the basis of advice from financial aid counselors at these schools who strongly discouraged her from working while in school.

11. Fecek has been a licensed Registered Nurse since 2010.

12. Fecek worked as a Registered Nurse at Prairie Lakes Health Care earning $22.00 an hour from 2010 to 2011 but voluntarily left for a new position at Rehabilitation Hospital of Indiana in 2011.

13. Fecek worked as a Registered Nurse at the Rehabilitation Hospital of Indiana earning $24.00 an hour but voluntarily left because of job security issues and limited opportunities for promotion.

14. Fecek is currently employed full time as a Registered Nurse at St. Vincent's Hospital, working a variable schedule and earning $22.70 an hour.

15. Fecek earned income of $25,101.00 in 2010, $49,167.00 in 2011, and $49,675.00 in 2012. For the first five months of 2013, she had gross earnings of $22,259.35, which annualizes to approximately $53,000.00.

16. In 2013 through the Trial, Fecek averaged net pay of $3,033.52 per month. Her optional payroll deductions include supplemental life insurance, a retirement savings plan, a cafeteria plan, and pre-paid legal assistance.

17. Fecek does not expect her income to increase by any more than 10% during the next 10 years. She stated that it is possible to earn a gross annualized income of $60,000.00 to $70,000.00 for registered nurses with many years of experience, but she did not expect to make that much because she has only recently changed careers.

18. Fecek testified that the passage of the Affordable Care Act and its implementation has altered the healthcare business and negatively impacted her income prospects. She stated that her employer did not give her and her co-workers raises during 2013 and that about 800 jobs had

been cut at St. Vincent's. She does not fear for her own job but worries about the current industry instability.

*Expenses*

19.The median annual income for a single person residing in Indiana was $41,236.00 on the Petition Date, and since then has slightly increased to $41,250.00 based on Census Bureau data furnished by the United States Trustee ("UST") as part of the Means Test. http://www.justice.gov/ust/eo/bapcpa/20121101/bci_data/median_income_table.htm and http://www.justice.gov/ust/eo/bapcpa/20131115/bci_data/median_income_table.htm (last visited March 25, 2014).

20.Fecek identifies monthly expenses totaling $3,002.10 in Schedule J of her bankruptcy petition. Fecek lists:

a.$705 for rent
b.$210 for electricity and heating fuel
c.$163 for cable/internet
d.$95 for cell phones
e.$5 for trash
f.$50 for home maintenance
g.$450 for food
h.$50 for clothing
i.$30 for dry cleaning
j.$40 for medical and dental expenses
k.$285 for transportation
l.$150 for recreation
m.$85 for auto insurance
n.$309.10 for car payments, (pursuant to a reaffirmation agreement between Fecek and Old National Bank filed in Fecek's bankruptcy case, which should end around June 2014)
o.$250 for student loan, (projected)
p.$100 for personal care
q.$5 for postage/bank expenses
r.$20 for eye care

21. Fecek's vehicle is a 2005 model that she expects she will need to replace in the near future.

22. Billing statements from Duke Energy show Fecek is enrolled in a budget billing plan and that she pays $123.00 per month to Duke.

23. Billing statements from Comcast show Fecek's actual monthly expense for cable/internet is $245.76 per month.

24. Fecek's bank statements from December 13, 2011 to January 11, 2013 show a variety of different monthly purchases and expenses. The statements show that she consistently paid approximately $103.00 per month to Chase Bank on a student loan debt that is not a part of this adversary proceeding and has not been discharged.

25. The precise amount of Fecek's new monthly payment on the Federal Loan is unknown because of a dearth of evidence. However, the Court finds that Fecek's monthly payment amount on the Federal Loan is likely no less than $450.00 based on a projected adjusted gross income in 2013 of $53,000.00 and 150% of the current Department of Health and Human Services poverty guidelines. http://aspe.hhs.gov/poverty/14poverty.cfm and http://studentaid.ed.gov/repay-loans/understand/plans/income-based (last visited March 27, 2014).

26. The largest category of expenses shown on Fecek's bank statements other than student loan payments and rent payments consists of purchases from grocery stores like Kroger and Marsh. There are occasional expenses for restaurants, entertainment, fuel purchases, and vehicle maintenance. Fecek makes periodic purchases from retailers like Old Navy, GAP, Target, Bath & Body Works, and Amazon.

*Educational Loan Debt Payments*

27. Fecek made payments totaling $2,270.17 on the Educational Loan Debt, all of which were made after the date Fecek first retained her attorney in this case.

28. Fecek did not believe Sallie Mae would accept partial payments prior to consulting with her attorney.

29. Fecek made payments on other student loan debts prior to the Petition Date as shown on her bank statements.

30. Prior to bringing this adversary proceeding, Fecek contacted Sallie Mae on more than one occasion to try to work out a payment agreement, but she testified that Sallie Mae refused to discuss alternative payment arrangements because the loans were private.

## Conclusions of Law

1. Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

2. This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(b) and 1334 and the General Order of Reference issued by the United States District Court for the Southern District of Indiana on July 11, 1984.

3. Venue of this adversary proceeding is proper in this Court and Division pursuant to 28 U.S.C. § 1409(a).

4. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

5. The dischargeability of student loans is governed by § 523(a)(8), which states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt –
    (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
        (A)(i) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program

>funded in whole or in part by a governmental unit or nonprofit institution; or …
>(B)   any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual; ….

6. In *Matter of Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993), the Seventh Circuit Court of Appeals adopted the three-prong test for undue hardship articulated by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) (*per curiam*), as follows:

>(1)   that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>(2)   that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>(3)   that the debtor has made good faith efforts to repay the loans.

7. Fecek "has the burden of establishing each element of the test by a preponderance of the evidence." *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

*First Prong – Minimal Standard of Living*

8. The starting point for the inquiry is whether Fecek can maintain a minimal standard of living if forced to repay the Educational Loan Debt. *Roberson*, 999 F.2d at 1135. "…[O]nly if the debtor meets this test should the court examine the other two *Brunner* requirements." *Id*.

9. "This test requires 'more than a showing of tight finances, and is not met merely because repayment of the borrowed funds would require some major personal or financial sacrifices'…However, the test does not require a debtor to demonstrate that repayment of the loan would cause her…to live at or below poverty level." *In re Shirzadi*, 269 B.R. 664, 668

(Bankr. S.D. Ind. 2001) (citing *Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 26 (Bankr.D.Conn. 1999) and *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 271 (Bankr. E.D.N.Y. 1998)) (internal citations omitted).

10. Though Fecek can likely reduce some of her living expenses listed on schedule J such as her cable/internet bill, fully minimizing her expenses would not yield enough savings to enable her to pay the entirety of the Educational Loan Debt without forcing her to experience less than a "minimal" standard of living. Fecek's current monthly income of $3,033.52 is largely spent on expenses necessary to maintain a minimal standard of living like rent, utilities, transportation, and food. If forced to repay the Educational Loan Debt at the higher figure of $2,677.35 as her contractual required monthly payment, Fecek would only have $356.17 left over to pay all of her living expenses. If the Court accepts the lower figure of $2,000.00 as her contractual required monthly payment, Fecek would still only have $1,033.52 left over to pay all of her living expenses.

11. The Court takes judicial notice of (a) the Internal Revenue Service ("IRS") local standards for housing and utilities in Hamilton County, Indiana of $1,586 per month http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Indiana-Local-Standards-Housing-and-Utilities (last visited March 26, 2014); and (b) the UST's housing and utilities standards for Hamilton County, Indiana of $1,156/month. http://www.justice.gov/ust/eo/bapcpa/20130501/bci_data/housing_charts/irs_housing_charts_IN.htm (last visited March 26, 2014). Under either of the monthly payment amounts, the funds Fecek would have left over each month after paying such payment fall below both the IRS and UST standards without accounting for other reasonable living expenses such as food, transportation, and her other student loan payments.

12. If forced to repay the Educational Loan Debt, Fecek would not be able to maintain a minimal standard of living. Fecek has satisfied the first prong of the *Brunner* test.

*Second Prong – State of Affairs is Likely to Persist*

13. The second prong of the *Brunner* test requires "that the debtor show [her] dire financial condition is likely to exist for a significant portion of the repayment period." *Roberson* 999 F.2d at 1135. "'Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is undue.'" *Roberson*, 999 F.2d at 1136 (quoting *Brunner*, 831 F.2d at 396).

14. "[T]he dischargeability of student loans should be based upon the *certainty of hopelessness*, not simply a present inability to fulfill financial commitment." *Goulet*, 284 F.3d at 778) (citation omitted in original) (emphasis added in original).

15. Regardless of the lack of evidence regarding the appropriate "repayment period," the Court finds that Fecek has shown that she will be unable to pay the entire amount of the Educational Loan Debt during any reasonable repayment period.

16. While Fecek's income will hopefully improve with time as she gains experience, she testified that she did not expect to make more than $60,000.00 to $70,000.00 in annual gross income during her career and even then, only after many years of working.

17. Fecek returned to school to become a nurse in part to enhance her earning potential. It is unrealistic to expect her to be able to effect another change to a higher-paying career without incurring additional educational loans that she has little if any chance of repaying. Rather than producing the intended effect of generating more income available to pay the Educational Loan Debt, it would more likely have the negative outcome of further increasing the

student loan debt she is currently unable to pay.

18.     Moreover, because the loans are private, Fecek is not eligible for the William D. Ford program and thus there are no options for her to reduce her payment to a manageable level without Sallie Mae's cooperation.

19.     Fecek has no realistic likelihood of being able to pay the Educational Loan Debt either now or at any time in the foreseeable future because the total amount owed and the interest rates on the Educational Loan Debt (7.75%-9.75%) are so high.

20.     The Court concludes that Fecek's hardship will exist throughout the remainder of the repayment period. The size of the Educational Loan Debt and the lack of realistic options for Fecek to increase her income or reduce her payment amount demonstrate that she will almost certainly never be able to pay back the entire amount without a miraculous change in her financial situation. Fecek has satisfied the second prong of the *Brunner* test.

*Third Prong – Good Faith*

21.     The third prong of the *Brunner* test requires that Fecek show she has made good faith efforts to repay the loans. *Roberson*, 999 F.2d at 1136. "With the receipt of a government-guaranteed education[3], the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses… Furthermore, undue hardship encompasses a notion that the debtor may not willfully or negligently cause [her] own default, but rather [her] condition must result from 'factors beyond [her] reasonable control.'" *Id*. (internal citations omitted).

22.     Fecek currently earns approximately $53,000.00 in annual gross income and her undisputed testimony was that she could expect an increase in her annual gross income to

---

[3] The Educational Loan Debt is not government-guaranteed but because neither party raised the issue, the Court has determined that the *Brunner* test still applies in this case.

anywhere between $60,000.00 and $70,000.00 a year after many years of experience in the nursing profession. Though Fecek moved to a slightly lower paying job, her small decrease in income is immaterial to the determination that she has maximized her income because she testified that she believed her new job was more stable and offered her more opportunities for advancement. The benefits of her new job outweigh the slightly higher pay of her old job. A more stable position with more opportunities for advancement benefits both Fecek and Sallie Mae because it makes it more likely that Fecek can continue to pay during the repayment period.

23. As described earlier, though Fecek can likely reduce some of her expenses, she cannot reduce them enough to materially improve her ability to pay the entirety of the Educational Loan Debt.

24. Good faith does *not* entail commitment to future efforts to repay. *Krieger v. Educ. Credit Mgmt. Corp. (In re Krieger)*, 713 F.3d 882, 884 (7th Cir. 2013) (emphasis added).

25. Although Fecek has not made many payments during the repayment period, she did attempt to reach out to Sallie Mae a number of times to try to work out some kind of payment arrangement that would enable her to avoid default and pay down the Educational Loan Debt. Sallie Mae offered no evidence to refute Fecek's testimony that Sallie Mae refused to consider alternate payment arrangements. Fecek is not eligible to enroll in any of the William D. Ford alternate repayment plans because the Educational Loan Debt consists of private student loans.

26. After first meeting with her attorney, Fecek made payments towards the Educational Loan Debt in the total amount of $2,270.17. Prior to consulting with her attorney, she believed that Sallie Mae would refuse partial payments and therefore did not make any payments.

27.     Fecek knew that her income was insufficient to pay the Educational Loan Debt and sought to make arrangements with Sallie Mae to address the problem. When advised that she could make partial payments, she began making partial payments. Prior to the commencement of this adversary proceeding, Sallie Mae had little incentive to alter the terms of Fecek's loans given the preferential treatment of student loan debt in the Bankruptcy Code.

28.     Fecek incurred the Educational Loan Debt on the advice of financial aid counselors who told her that she would not be able to work and go to school at the same time. In hindsight, the decision to take on such a large amount of debt looks like a poor one. However, it is hard to fault Fecek given that students all across the country have made similar choices based on similar advice. *See Krieger*, 713 F.3d at 886 (Manion, J., concurring). Furthermore, because Fecek's Educational Loan Debt is a private student loan, Sallie Mae was free to engage in its own evaluation of Fecek's credit-worthiness and ability to pay before it decided to loan her a substantial amount of money to finance her education.

29.     While Fecek could have made some partial payments to Sallie Mae after her repayment period began, the Court finds that she nevertheless acted in good faith. Given the sheer size the Educational Loan Debt and the lack of options for resolving her payment problem with Sallie Mae, Fecek's attempt to seek out an alternate payment plan with Sallie Mae was the only truly rational course of action she could have taken. Fecek has maximized her income, and she could never minimize her expenses enough to afford to pay the entirety of the Educational Loan Debt.

30.     Fecek has satisfied the third prong of the *Brunner* test.

***Partial Discharge***

31.     Although it would be an undue hardship on Fecek if she were forced to repay the

entire Educational Loan Debt, the evidence shows that it would not be an undue hardship for her to pay back some portion of it.

32. Fecek's income is above the median annual income for a single person residing in Indiana. She is not married and has no dependents. While she has maximized her income, Fecek could minimize some of her current expenses, such as her high cable/internet bill. The monthly expenditures and purchases listed in Fecek's bank statements are not unreasonable or frivolous but do demonstrate that Fecek has some room within her monthly budget to reduce discretionary spending.

33. Moreover, Fecek has already demonstrated that she can afford to make partial payments to Sallie Mae because she was able to pay $2,270.17 to Sallie Mae prior to the Petition Date, and her schedule J expenses show a $250.00 student loan expense. Now that she has obtained a discharge of her other debts – including some of her other student loan debt – her debt burden should be substantially reduced such that she will be able to make ongoing payments toward the Educational Loan Debt.

34. The Court acknowledges that Fecek's budget will be negatively impacted with the addition of the new payment on the Federal Loan of about $450.00 per month. The Court concludes that partial payment of the Educational Loan Debt would not create an undue hardship but might constitute a major personal or financial sacrifice that Congress deemed acceptable for debtors. *See Shirzadi*, 269 at 668 (citations omitted).

35. While the Seventh Circuit has not specifically addressed the issue of partial discharge of student loan debts, many courts have adopted the position that partial discharge is consistent with the language of § 523(a)(8). *See Miller v. Pa Higher Educ. Assistance Agency (In re Miller),* 377 F.3d 616, 622 (6th Cir. 2004) (citing cases), *In re Coatney*, 345 B.R. 905, 911

(Bankr. C.D. Ill. 2006), *Shirzadi*, 269 B.R. at 673.

36.     "Partial discharge, as well as other modifications to student loan obligations, allows a bankruptcy court to reach a more equitable result, tailored to a debtor's specific financial situation. The debtor is better able to achieve a fresh start, while still preserving the policy goals behind § 523 (a)(8)." *Shirzadi*, 269. B.R. at 672 n.6. The Seventh Circuit has approved of relief to the debtor short of a complete discharge. *Roberson*, 999 F.2d at 1138.

37.     The Court orders that Fecek shall pay $500.00 a month towards the Educational Loan Debt due on the first of every month for 180 months. The Court believes that Fecek can afford this amount based on the evidence presented, including a review of her budget and bank statements, and a projection of her other student loan payments. Any amount in excess of this amount is declared dischargeable.

38.     The Court further orders that Fecek shall not be required to make any payments towards the Educational Loan Debt for six months following the entry of these Findings of Fact and Conclusions of Law and the accompanying Judgment. The Court believes that a grace period will enable Fecek to adjust her expenses and lifestyle to better ensure her ability to make the payments ordered hereunder. Fecek shall begin payments starting in September 2014.

39.     The Court acknowledges that it is difficult to predict Fecek's future earnings potential because there are many factors outside of her control that could impact her future ability to pay like another financial crisis or unexpected health issues. Should there be a substantial change in Fecek's financial or personal situation that renders her unable to pay, she may move to reopen her bankruptcy case and this adversary case for an evidentiary determination that she is entitled to a full discharge of the Educational Loan Debt or some other relief. If Fecek's income increases by more than 10% above $70,000 in annual gross income, the

amount that the evidence has shown she expects to earn later in her career, she is obligated to report the change to Sallie Mae. The parties may then agree to a new payment amount or may seek a new evidentiary determination of Fecek's ability to pay the Educational Loan Debt.

40.     The Court encourages Sallie Mae to be sensitive to the economic realities of debtors in Fecek's situation. Should the parties agree to a different, better resolution at a later date, the parties may jointly move to reopen the case and seek relief from the Judgment to implement a new agreement.

Accordingly, the Court concludes that the Educational Loan Debt owed by Fecek to Sallie Mae is PARTIALLY DISCHARGEABLE. The Court will enter partial judgment in favor of Fecek and against Sallie Mae.

# # #